1   ANDREW L. PACKARD (State Bar No. 168690)
    ERIK ROPER (State Bar No. 259756)
2   EMILY J. BRAND (State Bar No. 267564)
    Law Offices of Andrew L. Packard
3   100 Petaluma Blvd. N Ste 301
    Petaluma, CA 94952
4   Tel: (707) 763-7227
    Fax: (415) 763-9227
5   E-mail: andrew@packardlawoffices.com

6   Attorneys for Plaintiff CALIFORNIA
    SPORTFISHING PROTECTION ALLIANCE
7

8              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
9

10

11  CALIFORNIA SPORTFISHING              Case No. 3:12-CV-03122-RS
    PROTECTION ALLIANCE, a non profit
12  corporation,
                                          STIPULATION TO DISMISS
13              Plaintiff,                PLAINTIFF'S CLAIMS WITH
                                          PREJUDICE; [PROPOSED] ORDER
         vs.                              GRANTING DISMISSAL WITH
14                                        PREJUDICE [FRCP 41(a)(2)]
    BIG CREEK LUMBER COMPANY, a
15  California corporation; MICHAEL
    TUTTLE, an individual,
16

17              Defendants.

18

19  TO THE COURT:

20      Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and

21  Defendants Big Creek Lumber Company and Michael Tuttle (collectively, "DEFENDANTS"),

22  Parties in the above-referenced matter, stipulate as follows:

23      WHEREAS, on or about April 18, 2012, CSPA provided DEFENDANTS with a Notice

    of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal
24
    Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;
25
        WHEREAS, on June 18, 2012, CSPA filed its Complaint against DEFENDANTS in this
26
    Court, *California Sportfishing Protection Alliance v. Big Creek Lumber Company, et al.* (USDC,
27
    N.D. Cal., Case No. 3:12-CV-03122-RS) and said Complaint incorporated by reference all of the
28

1    allegations contained in CSPA's 60-Day Notice Letter;

2    **WHEREAS**, CSPA and DEFENDANTS, through their authorized representatives and

3    without either adjudication of CSPA's claims or admission by DEFENDANTS of any alleged

4    violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations

5    of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs

6    and uncertainties of further litigation.  A copy of the Parties' proposed Consent Agreement

7    ("Consent Agreement") entered into by and between CSPA and DEFENDANTS is attached

8    hereto as Exhibit A and incorporated by reference.

9    **WHEREAS**, CSPA submitted the Consent Agreement via certified mail, return receipt

10   requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day

11   review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the

12   agencies.

13   **NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between

14   the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be

15   dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties

16   respectfully request an order from this Court dismissing such claims with prejudice.  In

17   accordance with Paragraph 8 of the Consent Agreement, the Parties also request that this Court

18   enter the Consent Agreement and retain and have jurisdiction over the Parties through September

19   30, 2014, for the sole purpose of resolving any disputes between the parties with respect to

20   enforcement of any provision of the Consent Agreement.

21

22

23

24

25

26

27

28

1    Dated:  11/1/2012                LAW OFFICES OF ANDREW L. PACKARD

2

3                                     By:___/s/___Emily J. Brand_____
4                                     Emily J. Brand
                                      Attorneys for Plaintiff
5                                     CALIFORNIA SPORTFISHING PROTECTION
                                      ALLIANCE
6

7    Dated:  11/1/2012                DOWNEY BRAND, LLP

8
                                      By:___/s/ Nicole E. Granquist_____
9                                     (As authorized on November 1, 2012 – L.R. 131)
                                      Nicole E. Granquist
10                                    Attorneys for Defendants
                                      BIG CREEK LUMBER COMPANY, *et al.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**[PROPOSED] ORDER**

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's claims against Defendants BIG CREEK LUMBER COMPANY and MICHAEL TUTTLE as set forth in CSPA's 60-Day Notice Letter and Complaint filed in Case No. 3:12-CV-03122-RS, are hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as provided for by the terms of the accompanying Settlement Agreement.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under the Consent Agreement attached to the Parties' Stipulation to Dismiss as Exhibit A.

IT IS SO ORDERED.

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

Dated: _11/5/12_____    _____

United States District Court Judge

**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
ERIK M. ROPER (State Bar No. 259756)
EMILY J. BRAND (State Bar No. 267564)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com
        Erik@packardlawoffices.com
        Emily@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br>             Plaintiff, <br><br>     vs. <br><br> BIG CREEK LUMBER COMPANY, a California corporation; and, MICHAEL TUTTLE, an individual, <br><br>          Defendants. | Case No. 2:12-cv-03122-RS <br><br> **[PROPOSED] CONSENT AGREEMENT** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA" or "Plaintiff") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendant Big Creek Lumber Company ("Big Creek") owns and operates an approximately 30-acre sawmill and planing mill facility located at 3564 Highway 1 outside Davenport, California (the "Facility"), and Defendant Michael Tuttle ("Tuttle") is the Environmental Manager of the Facility and in this capacity he implements the environmental operations and maintenance of the Facility;

1  **WHEREAS,** Defendants Big Creek and Tuttle are collectively referred to as "Defendants";

2  **WHEREAS,** CSPA and Defendants collectively shall be referred to as the "Parties;"

3  **WHEREAS**, the Facility collects and discharges storm water into Arroyo Las Trancas Stream

4  and an unnamed creek, which flow near the Facility into the Pacific Ocean (a map of the Facility is

5  attached hereto as **Exhibit A** and incorporated herein by reference);

6  **WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant

7  to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001

8  [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water

9  Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act,

10  33 U.S.C. § 1342 (hereinafter "General Permit");

11  **WHEREAS**, on or about April 18, 2012, Plaintiff provided notice of Defendants' violations of

12  the Act, and of its intention to file suit against Defendants ("Notice Letter"), to the Administrator of

13  the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX;

14  the Executive Director of the State Water Resources Control Board ("State Board"); the Executive

15  Officer of the Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and

16  to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's

17  Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

18  **WHEREAS**, Defendants deny the occurrence of the violations alleged in the Notice Letter and

19  maintain that they have complied at all times with the provisions of the General Permit;

20  **WHEREAS**, CSPA filed a complaint ("Complaint") against Defendants in the United States

21  District Court, Northern District ("District Court") of California, on June 18, 2012;

22  **WHEREAS**, for purposes of this Consent Agreement, the Parties stipulate that venue is proper

23  in this Court, and that Defendants do not contest the exercise of jurisdiction by this District Court to

24  enter this Consent Agreement;

25  **WHEREAS**, this Consent Agreement shall be submitted to the United States Department of

26  Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c) and 40 C.F.R. §135.5,

27  which shall be referred to herein as the "Agency Review Period"; and shall thereafter be submitted for

28

- 2 -

[PROPOSED] CONSENT AGREEMENT

approval by the District Court;

WHEREAS, at the time the Consent Agreement is submitted for approval to the District Court, CSPA shall request a dismissal of the Complaint with prejudice and the Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this Consent Agreement as provided herein;

WHEREAS, the date of the District Court's Order granting dismissal of CSPA's Complaint with prejudice and retaining jurisdiction for the enforcement of this Consent Agreement shall be referred to herein as the "Court Approval Date." This date is also the "Effective Date" of this Consent Agreement;

AND WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter without further litigation.

NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:

I.   BIG CREEK COMMITMENTS

1.   **Compliance With General Permit & Clean Water Act.**  Upon the Effective Date, and throughout the term of this Consent Agreement, Big Creek shall operate the Facility in compliance with the applicable requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law, and recognizing the actions described below.

2.   **Big Creek's Implementation of Specific Storm Water Best Management Practices On Or Before October 1, 2012.**  On or before October 1, 2012, Big Creek shall complete the implementation of the following storm water control best management practices ("BMPs"):

(a)   At the South discharge point, Big Creek shall modify the existing settling basin as follows: (i) remove current built-up sediment; (ii) widen the basin as permitted by existing site geometry; (iii) re-grade the basin to provide for tiered flows; and (iv) install additional filtration devices within and/or at the inlet of the basin (baffle screens, filter cloth, silt fencing, and/or vegetation, as appropriate).  The settling basin will be designed to handle storm water flows for a 1-hour, 2-year storm event at the Facility.  An annual maintenance program will

also be implemented to ensure that the infrastructure is properly maintained.

(b)     At the North discharge point, Big Creek shall engineer and install a vegetated bioswale that will handle storm water flows for a 1-hour, 2-year storm event at the Facility and conduct an annual maintenance program to ensure the infrastructure is properly maintained.  A gravel filter berm will be installed just upstream of the bioswale to slow the discharge flow and provide additional filtration.

(c)     At the West discharge point, if the storm water discharge samples from the West location contain pollutants with values in excess of EPA benchmarks during the 2012-2013 Wet Season, Big Creek shall evaluate additional BMPs appropriate for the pollutant(s) and values detected.  This evaluation will be described in the Action Memorandum due July 1, 2013 and BMPs will be installed by the start of the 2013-2014 Wet Season.

(d)     Big Creek shall create, use, and maintain a visual inspection checklist for use during visual inspections of storm water and non-storm water discharges from the Facility;

(e)     Big Creek shall regularly monitor and maintain BMPs and drop inlets, and the storm water drainage system, in order to identify and remove settled contaminants from storm water drains and conveyances therein; document such maintenance; and maintain records thereof with the SWPPP for the Facility as required by the terms of the General Permit. Further, Big Creek shall ensure that appropriate personnel are properly trained in storm water management and that records of any such storm water management training of Facility personnel shall also be maintained along with the SWPPP for Facility;

(f)     Big Creek shall install a rainfall recording device at the Facility and maintain documentation along with the Facility SWPPP of the daily rainfall occurring at the Facility during the 2012-2013 and the 2013-2014 Wet Seasons.  In addition to the rainfall data gathered from the rainfall recording device described herein, Big Creek may elect to also maintain documentation of precipitation data recorded off-site at other nearby, reliable and objectively verifiable rainfall gauges (*e.g.,* as found on a website maintained by a government agency);

(g)     Big Creek shall employ a vacuum-type sweeper to sweep all paved exterior

- 4 -

ground surfaces at the Facility by October 15, 2012 and October 12, 2013.  If no storms that produce more than 0.5 inches of rain have occurred before December 1, 2012 or December 1, 2013, Big Creek shall employ a vacuum-type sweeper to sweep all paved exterior ground surfaces at the Facility before December 10, 2012 and/or December 10, 2013.  Big Creek shall hand or vacuum sweep to remove debris on paved exterior surfaces within thirty (30) feet of a storm water inlet, culvert, or other structures designed to convey storm water from the paved exterior surface twice a week during the wet season and monthly during the dry season.  Big Creek shall retain documentation of their use of a vacuum-type sweeper, maintain such documentation at the Facility along with the Facility SWPPP, and shall provide documentation of the initial use of the vacuum-type sweeper by October 15 or December 10 of each year (2012 and 2013) to CSPA within seven (7) calendar days of Big Creek's use of a vacuum-type sweeper.

**3.     SWPPP Amendments/Additional BMPs.**  By October 1, 2012, Big Creek shall formally amend the Storm Water Pollution Prevention Plan ("SWPPP") for the Facility to incorporate all of the relevant requirements of this Consent Agreement, as well as the revised Facility map. Consistent with the General Permit, the SWPPP shall be amended to, among other things, describe the potential sources of contaminants at the Facility, describe and provide for the implementation of a scheduled storm water management training program for relevant Facility personnel, describe and provide for the proper implementation of an effective storm water monitoring and reporting program at the Facility, and to revise the SWPPP map.  Revisions to the SWPPP map shall identify, among other things, the location of all storm water drop inlets, the direction of storm water flows, and the location of structural BMPs implemented at the Facility.

**4.     Sampling Discharge Points.**  Big Creek shall collect samples during qualifying storm events from the three current discharge points (North, South, West) as well as an additional sampling point at the point of discharge in the eastern area of the Facility (East).  If the storm water discharge samples from the East location contain pollutants with values in excess of EPA benchmarks during the 2012-2013 Wet Season, Big Creek shall evaluate additional BMPs appropriate for the pollutant(s) and

- 5 -

values detected.  This evaluation will be described in the "Action Memorandum" due July 1, 2013 and BMPs will be installed by the start of the 2013-2014 Wet Season.

**5.      Sampling Frequency.**  Big Creek shall collect and analyze samples from four (4) storm events, as qualified in the General Permit[1] for sampling purposes, if possible, in each of the two Wet Seasons occurring during the term of this Consent Agreement (2012-2013 and 2013-2014).  The storm water sample results shall be compared with the values set forth in **Exhibit C**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit C**, Big Creek shall comply with the "Action Memorandum" requirements set forth below.

**6.      Sampling Parameters.**  All samples shall be analyzed for each of the constituents listed in **Exhibit C** by a laboratory accredited by the State of California.  All samples collected from the Facility shall be delivered to the laboratory as soon as practicable to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on **Exhibit C**.  Sampling results shall be provided to CSPA within ten (10) calendar days of Big Creek's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.

**7.      Sampling for parameters pH and Electrical Conductivity.**  Big Creek shall conduct pH and electrical conductivity sampling in the field at the point and time of sample collection, and will have laboratory samples analyzed for both constituents, as well.  Further, Big Creek shall collect at least one sample of pH and Electrical Conductivity from storm water in the undeveloped hillside area directly upstream of the Facility during the 2012-2013 Wet Season, to use as a comparative tool and establish background conditions.  If the results of pH and Electrical Conductivity sampling during the 2012-2013 Wet Season demonstrate that the Facility is generating low pH storm water, that is not representative of localized conditions, then Big Creek will evaluate additional treatment and/or

---

[1]  "Qualifying Storm Events" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is observed at the Discharge Point being sampled; and (iii) the samples are collected during daylight operating hours.

operational BMPs to address the low pH.

8.    **"Action Memorandum" Trigger; CSPA's Review Of "Action Memorandum";**
**Meet-and-Confer.**  If any sample taken during the two (2) Wet Seasons referenced in Paragraph 4 above exceeds the benchmark levels set forth in **Exhibit C**, or if Big Creek fails to collect and analyze samples from four (4) storm events, as qualified in the General Permit, or if Big Creek fails to timely comply with any of obligation set forth in this Consent Agreement, Big Creek shall prepare a written statement discussing the exceedance(s), the failure or inability to collect and analyze samples from four (4) qualifying storm events (*e.g.*, due to the weather patterns), and/or the failure to timely comply with any obligation set forth in this Consent Agreement ("Action Memorandum").  In the event that Big Creek's sampling evidences exceedances of any of the benchmark levels set forth in **Exhibit C**, the Action Memorandum shall discuss the possible cause(s) and/or source(s) of the exceedance(s), and what additional measures Big Creek will take to reduce or eliminate future exceedances.  In the event that Big Creek is unable or fail to collect and analyze samples from four (4) qualifying storm events, the Action Memorandum shall discuss the possible cause(s) and additional measures that will be taken by Big Creek to ensure that Big Creek collects and analyzes samples from four (4) storm events the following Wet Season (qualifying or non-qualifying), if possible.  In the event that Big Creek fails to timely comply with any other obligation set forth in this Consent Agreement, the Action Memorandum shall discuss the possible reason(s) for this failure, and what actions Big Creek has taken and/or will take in the future to remedy the failure to timely comply with any obligation set forth herein.  The Action Memorandum shall be provided to CSPA not later than July 1 following the conclusion of each Wet Season occurring during the term of this Consent Agreement.  Plaintiff and Big Creek agree that preparation and implementation of an Action Memorandum by Big Creek shall not give rise to any presumption that Big Creek has failed to comply with any obligations under the General Permit or the Clean Water Act pursuant to Paragraph 1 above.  Recognizing that a SWPPP is an ongoing iterative process meant to encourage innovative BMPs, such additional measures may include, but are not limited to, making material improvements to the storm water collection and discharge system, changing the frequency or quality of Facility sweeping, changing the type and

1    extent of storm water filtration media or modifying other industrial activities or management practices

2    at the Facility.  Within thirty (30) days of receipt of an Action Memorandum, CSPA may provide

3    comment on an Action Memorandum and suggest any alternative pollution prevention measures it

4    believes are appropriate.  Upon request by CSPA, Big Creek agrees to meet and confer in good faith

5    regarding the contents and sufficiency of the Action Memorandum.  Additional measures identified by

6    Big Creek in an Action Memorandum, to the extent feasible, shall be implemented within ninety (90)

7    days after the due date of the Action Memorandum, or the conclusion of the meet and confer process,

8    unless a longer timeframe is agreed to by Plaintiff and Big Creek, and for which agreement by

9    Plaintiff is not unreasonably withheld.  Within thirty (30) days of implementation, the Facility SWPPP

10   shall be amended to include all additional BMP measures designated in the Action Memorandum.

11          9.      **Inspections During The Term Of This Agreement.**  In addition to any mutually

12   agreed upon site inspections conducted as part of the meet-and-confer process concerning an Action

13   Memorandum as set forth above, Big Creek shall permit representatives of CSPA to perform one (1)

14   physical inspection of the Facility during the term of this Consent Agreement.  This inspection shall be

15   performed by CSPA's counsel and consultant(s) and may include sampling, photographing, and/or

16   videotaping and, if requested, CSPA shall provide Big Creek with a copy of all sampling reports,

17   photographs and/or video.  CSPA shall provide at least three (3) business days advance notice of such

18   physical inspection, except that Big Creek shall have the right to deny access if circumstances would

19   make the inspection unduly burdensome and pose significant interference with business operations or

20   any party/attorney, or the safety of individuals.  In such case, Big Creek shall specify at least three (3)

21   dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed.

22   Big Creek shall not make any alterations to Facility conditions during the period between receiving

23   CSPA's initial three (3) business days advance notice and the start of CSPA's inspection that Big

24   Creek would not otherwise have made but for receiving notice of CSPA's request to conduct a

25   physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws

26   or regulations.  Nothing herein shall be construed to prevent Big Creek from continuing to implement

27   any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

28

**10.    Big Creek's Communications To/From Regional and State Boards.**  During the term of this Consent Agreement, Big Creek shall provide CSPA with copies of all documents submitted to, or received from, the Regional Board or the State Board concerning storm water discharges from this Facility and/or Big Creek's compliance or lack of compliance with the General Permit, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit.  Such documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below and contemporaneously with Big Creek's submission(s) to such agencies.

**11.    SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, Big Creek shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of the Consent Agreement within fourteen (14) calendar days of such amendment.

**II.    MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

**12.    Mitigation Payment In Lieu Of Civil Penalties.**  As mitigation of the Clean Water Act violations alleged in CSPA's Complaint, Big Creek agrees to pay the sum of $33,000 within fifteen (15) calendar days after the Court Approval Date to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects to improve water quality in local watersheds of Santa Cruz County.  The Parties agree that the Rose Foundation will direct the funds to one or more proposals submitted by the Monterey Bay Salmon & Trout Project or the California Polytechnic State University Foundation Swanton Pacific Ranch Project, if a suitable grant application is submitted to the Rose Foundation by any one or more of these groups within six (6) months of the Effective Date of this Agreement.  To be suitable, a grant application submitted by either group shall include, but not be limited to, a description of the anticipated benefits to water quality in local watersheds of Santa Cruz County from the project and a program designed to quantify the project's anticipated benefits to water quality in local watersheds of Santa Cruz County.  If grant application(s) are not submitted by the Monterey Bay Salmon & Trout Project or the California Polytechnic State University Foundation Swanton Pacific Ranch Project, the Rose

- 9 -

Foundation retains discretion to direct the funds consistent with this paragraph.  The Rose Foundation shall not retain any portion of the funds, except for the normal cost necessary to cover its overhead, not to exceed 10% of the total project fund.  The Rose Foundation shall provide notice to the Parties within thirty (30) days of when the funds are dispersed by the Rose Foundation, setting forth the recipient and the purpose of the funds.  Payment shall be provided to the Rose Foundation by mailing it to: Rose Foundation, Attn: Tim Little, 6008 College Avenue, Oakland, CA 94618.

13.  **Compliance Monitoring Funding.**  To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Big Creek's compliance with this Consent Agreement, Big Creek agrees to contribute $4,500 for each of the two years covered by this Consent Agreement ($9,000 total for the life of the Consent Agreement), to a compliance monitoring fund maintained by counsel for CSPA as described below.  Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, review of annual reports, discussions with representatives of Big Creek concerning the Action Memoranda referenced above, and potential changes to compliance requirements herein, preparation for and participation in meet-and-confer sessions, water quality sampling and analysis, and compliance-related activities.  Big Creek's first payment in the amount of $4,500 shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" within fifteen (15) calendar days after the Court Approval Date.  Big Creek's second payment in the amount of $4,500 shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" by July 1, 2013.

14.  **Attorneys' and Expert/Consultants' Fees & Costs.**  Big Creek agrees to reimburse CSPA in the amount of $28,000 to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a resolution in the public interest.  Such payment shall be made to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" within fifteen (15) calendar days after the Court Approval Date.

[PROPOSED] CONSENT AGREEMENT

III.    **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

15.    With the exception of the timelines set forth above for addressing exceedances of values specified on **Exhibit C** and Action Memoranda, if a dispute under this Consent Agreement arises, or Plaintiff or Big Creek believes that a breach of this Consent Agreement has occurred, Plaintiff and Big Creek shall meet and confer within ten (10) calendar days of receiving written notification from the other party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If Plaintiff or Big Creek fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) calendar days have passed after the meet-and-confer occurred or should have occurred, either Plaintiff or Big Creek shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Agreement.  Plaintiff or Big Creek shall be entitled to seek: (1) injunctive relief as needed to remedy the alleged breach/breaches of the Consent Agreement; and, (2) reimbursement of fees and costs incurred in the litigation of any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

IV.    **MUTUAL RELEASE OF LIABILITY, COVENANT NOT TO SUE AND DISMISSAL**

16.    **Waiver and Release.**  As of the Court Approval Date, the Parties and their successors, assigns, directors, officers, agents, attorneys, representatives, and employees, hereby release all persons from any and all claims and demands of any kind, nature, or description, and from any and all liabilities, relief, damages, fees (including fees of attorneys, experts, and others), injuries, actions, or causes of action, either at law or in equity, whether known or unknown, arising from CSPA's allegations in the Notice Letter and/or the Complaint regarding Defendants' compliance with the General Permit and the Clean Water Act, including all claims for fees, costs, expenses, or any other sum incurred or claimed or which could have been claimed, up to and including the Court Approval Date, except as provided for in Section II of this Consent Agreement.

17.     The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

While CSPA asserts that California Civil Code section 1542 applies to general releases only, and that the release in Paragraph 16 above is a limited release, the Parties nonetheless hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from the allegations and claims as set forth in the Notice Letter and/or the Complaint.

18.     **Covenant Not to Sue.**  From the Court Approval Date and ending on the Termination Date, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against Defendants seeking relief for alleged violation of the Clean Water Act or the General Permit or any revisions, amendments, or successors to the General Permit, arising out of Defendants' operation of the Facility, nor will CSPA support such lawsuits against the Defendants brought by other groups or individuals by providing financial assistance, personnel time, or any other affirmative actions.

19.     **Dismissal.**  Upon expiration of the Agency Review Period, the Parties shall file with the District Court a Stipulation and Order that shall provide that:

a.     the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and

b.     the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Consent Agreement.  Nothing in this Consent Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.

**IV.    MISCELLANEOUS PROVISIONS**

20.    **No Admission.**  The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

21.    **Termination Date.**  The Consent Agreement shall terminate on September 30, 2014.

22.    **Counterparts.**  The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Consent Agreement shall be valid as an original.

23.    **Severability.**  In the event that any one of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

24.    **Construction.**  The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Consent Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

25.    **Choice of Law.**  This Consent Agreement shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

26.    **Authority.**  The undersigned are authorized to execute this Consent Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Agreement.

27.    All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein. This Consent Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Consent Agreement,

unless otherwise expressly provided for therein.

28. **Notices.** Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Bill Jennings, Executive Director
> California Sportfishing Protection Alliance
> 3536 Rainier Avenue
> Stockton, CA 95204
> E-mail: DeltaKeep@me.com

> With copies sent to:

> Andrew L. Packard
> Erik M. Roper
> Emily J. Brand
> Law Offices of Andrew L. Packard
> 100 Petaluma Boulevard North, Suite 301
> Petaluma, CA 94952
> Tel:  (707) 763-7227
> E-mail: Andrew@packardlawoffices.com
>           Erik@packardlawoffices.com
>           Emily@packardlawoffices.com

Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to Defendants pursuant to this Consent Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Janet McCrary Webb
> Michael Tuttle
> Big Creek Lumber Company
> 3564 Highway 1
> Davenport, CA 95017
> Tel: (831) 457-5023
> Fax.: (831) 423-2800
> E-mail: janetw@big-creek.com
>           michaelt@big-creek.com

> With copies sent to:

> Nicole Granquist
> Downey Brand, LLP
> 621 Capitol Mall, 18th Floor
> Sacramento, CA 95814

- 14 -

Tel: (916) 520-5369
Fax.: (916) 520-5769
E-mail: ngranquist@downeybrand.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

**29.    Electronic or Facsimile Signatures.**  Telecopy, pdf, and/or facsimile copies of original signatures shall be deemed to be originally executed.

**30.    Force Majeure.**  No Party shall be considered to be in default in the performance of any of its obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any circumstances beyond the Party's control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  A Force Majeure event does not include normal inclement weather or inability to pay.  Any Party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

**31.    Court Approval.**  If for any reason the District Court should decline to approve this Consent Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Consent Agreement within thirty (30) calendar days so that it is acceptable to the District Court.  If the Parties are unable to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall become null and void.

**32.    Negotiated Agreement.**  This Consent Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Party on the ground that any such Party drafted it.

**33.    Full Settlement.**  This Consent Agreement constitutes a full and final settlement of this matter.  The Parties expressly understand and agree that each Party has freely and voluntarily entered into this Consent Agreement with and upon advice of counsel.

**34.    Integration Clause.**  This Consent Agreement and its attached exhibits contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written,

- 15 -

1  respecting the matters covered by this Consent Agreement.

2      **35.   Modification.**  This Consent Agreement may be amended or modified only by a writing

3  signed by the Parties or their authorized representatives, and then by order of the District Court.

4      **36.   Cure.**  Except in case of an emergency but subject to the regulatory authority of any

5  applicable governmental authority, any breach of or default under this Consent Agreement capable of

6  being cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged

7  breach or default, or within such other period approved in writing by the Party not making such

8  allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default

9  has completed such cure or, if the breach or default can be cured but is not capable of being cured

10  within such five (5) day period, has commenced and is diligently pursuing to completion such cure.

11      The Parties hereto enter into this Consent Agreement and respectfully submit it to the District

12  Court for its approval and entry as an Order and Final Judgment.

13

14  Dated: _____     California Sportfishing Protection Alliance

15

16                              By:  _____

17                                   Bill Jennings, Executive Director

18  Dated: 9/10/12              Big Creek Lumber Company

19

20                              By:  _____

21                                   Janet McCrary Webb

22

23  Dated: 09/10/2012           Michael Tuttle

24

25                              By:  _____

26                                   Michael Tuttle

27

28                                   - 16 -

1   respecting the matters covered by this Consent Agreement.

2       **35.    Modification.** This Consent Agreement may be amended or modified only by a writing

3   signed by the Parties or their authorized representatives, and then by order of the District Court.

4       **36.    Cure.** Except in case of an emergency but subject to the regulatory authority of any

5   applicable governmental authority, any breach of or default under this Consent Agreement capable of

6   being cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged

7   breach or default, or within such other period approved in writing by the Party not making such

8   allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default

9   has completed such cure or, if the breach or default can be cured but is not capable of being cured

10  within such five (5) day period, has commenced and is diligently pursuing to completion such cure.

11      The Parties hereto enter into this Consent Agreement and respectfully submit it to the District

12  Court for its approval and entry as an Order and Final Judgment.

13

14  Dated: _10 Sept 2012_          California Sportfishing Protection Alliance

15

16                                 By: _____

17                                     Bill Jennings, Executive Director

18  Dated: _____         Big Creek Lumber Company

19

20

21                                 By: _____
                                       Janet McCrary Webb

22

23  Dated: _____         Michael Tuttle

24

25                                 By: _____
26                                     Michael Tuttle

27

28                                      - 16 -
                              [PROPOSED] CONSENT AGREEMENT

**APPROVED AS TO FORM:**

Dated: Sept. 10, 2012          Law Offices of Andrew L. Packard

                              By: _____
                                  Emily J. Brand
                                  Attorneys for Plaintiff

Dated: Sept. 10, 2012          Downey Brand LLP

                              By: _____
                                  Nicole E. Granquist
                                  Attorneys for Defendants

- 17 -
[PROPOSED] CONSENT AGREEMENT

**EXHIBIT A – Facility Site Map**



# STORMWATER MAP 1 - SAWMILL SITE

Portion of Section 2, T10S - R3W
and Portion of Rancho Agua Puerca Y Las Trancas
Santa Cruz County, California

## Legend

### Operation Area

| | Structure |
| | Permeable |
| | Asphalt |

### Sawmill Sub-watersheds

**Description and Potential Pollutant Groups**

- Wholesale Yard North/Upper Log Deck (Groups 1,2,3)
- Wholesale Yard South/Lower Log Deck (Groups 1,2,3,4)
- Wholesale/Yard West (Groups 1,2,3)
- Back Canyon Road (Group 4)

### Sampling/Discharge Point

- West
- South
- North
- East

### Stormwater Transport Infrastructure

- Subsurface Culvert
- Open Ditch
- Flume
- Grate
- Silt Trap
- Municipal Storm Drain
- Setting Pond
- On-Site Pond
- Watercourse
- Raw Log Deck
- Sawn Lumber Units
- Shipping and Recieving Area
- CA State Highway 1

Northern Division Pipe

### Potential Storm Water Pollutants by Group

Group 1 - Vehicle Related Liquids: gasoline, diesel, grease, motor oil, anti-freeze
Group 2 - Vehicle Related Dust: tire dust, brake dust, soil
Group 3 - Operational Equipment Related Liquids: hydraulic oil, grease, lube oils
Group 4 - Operational Equipment / Process Related Solids: sawdust, bark

| Number | Structure Use | Number | Structure Use |
|---|---|---|---|
| 1 | Forestry Office/Warehouse | 11 | Log Debarker |
| 2 | Lube/Hazardous Waste Storage | 12 | Sawdust Hoppers |
| 3 | Maintenance Building | 13 | Planter Building |
| 4 | Lube Storage | 14 | Fueling Area Underground Storage Tanks & Pump House |
| 5 | Cameleers Shed/Equipment Storage | 15 | Lumber Unit Demolisher |
| 6 | Equipment/Material Building | 16 | Equipment Building |
| 7 | Fueling Area (Diesel Tanks (20,000 gal)) | 17 | Restroom/Storage |
| 8 | Lube Storage | 18 | Equipment Wash Station |
| 9 | Sawmill Building | 19 | Drysheld Storage |
| 10 | Chipper House | | |

Arroyo de las Trancas

Pacific Ocean

200 100 0 200 Feet

N

**EXHIBIT B – Notice of Violation**



April 18, 2012

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Michael Tuttle, Environmental Manager
Frank Hutchinson, Service Manager
Big Creek Lumber Company
3564 Highway 1
Davenport, CA 95017-3564

Homer McCrary, Registered Agent for Service of Process
Big Creek Lumber Company
3564 Highway 1
Davenport, CA 95017-3564

**Re:      Notice of Violations and Intent to File Suit Under the Federal Water
            Pollution Control Act**

Dear Messrs. McCrary, Tuttle and Hutchinson:

   I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the Big
Creek Lumber Company ("Big Creek Lumber") facility, located at 3564 Highway 1
approximately seven miles north of Davenport, California ("the Facility").  The WDID
identification number for the Facility is 3 44I009177.  CSPA is a non-profit public
benefit corporation dedicated to the preservation, protection and defense of the
environment, wildlife and natural resources of California waters and the Pacific Ocean.
This letter is being sent to you as the responsible owner, officer, or operator of the
Facility.  Unless otherwise noted, Big Creek Lumber Company, Michael Tuttle and Frank
Hutchinson shall hereinafter be collectively referred to as Big Creek Lumber.

   This letter addresses Big Creek Lumber's unlawful discharges of pollutants from
the Facility to Arroyo Las Trancas stream and unnamed creeks, which then convey storm
water discharged from the Facility to the Pacific Ocean.  This letter addresses the
ongoing violations of the substantive and procedural requirements of the Clean Water Act

Notice of Violation and Intent To File Suit
April 18, 2012
Page 2 of 21

and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

## I.      Background.

Big Creek Lumber owns and operates a sawmill and planing mill facility located approximately seven miles north of Davenport, California.  The Facility falls under Standard Industrial Classification ("SIC") Code 2421 ("Sawmills and Planing Mills, General").  The Facility is primarily used to receive, store, handle, manufacture, sell and distribute lumber materials and products.  Other activities at the Facility include the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

Big Creek Lumber collects and discharges storm water from its approximately 30-acre Facility through at least three (3) discharge points into Arroyo Las Trancas stream, unnamed creeks, and ultimately into the Pacific Ocean.  The Pacific Ocean is a water of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for the Pacific Ocean in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan").  The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of water quality characteristics for ocean waters to ensure the reasonable protection of beneficial uses and the prevention of nuisance.  The discharge of waste shall not cause violation of these objectives."  *Id*. at 4.  The Ocean Plan limits the concentration of organic materials in marine sediment to levels that not would degrade marine life.  *Id*. at 6.  The Basin Plan establishes ocean water quality objectives, including that dissolved oxygen is not to be

less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.  It also establishes that toxic metal concentrations in marine habitats shall not exceed:  Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L.  *Id.* at III-12.

 The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L.  *Id*. at III-7.  The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L.  The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L and zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

 The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 C.F.R. § 131**.**38**.**  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

 The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  It identified that the Pacific Ocean between Point Año Nuevo to Soquel Point as failing to meet water quality standards due to the pollutant/stressor Dieldrin.  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

---

[1] *See*
http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 4 of 21

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Big Creek Lumber: zinc – 0.117 mg/L; pH – 6.0 – 9.0 s.u.; oil & grease – 15 mg/L; chemical oxygen demand – 120 mg/L; and total suspended solids – 100.0 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance – 200 μmhos/cm and total organic carbon – 110 mg/L. Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, aluminum – 0.75 mg/L; ammonia-nitrogen – 19 mg/L; arsenic – 0.16854 mg/L; biochemical oxygen demand – 30 mg/L; cadmium – 0.0159 mg/L; copper – 0.0636 mg/L; iron – 1.0 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L; lead – 0.0816 mg/L; and, hardness.

## II.     Big Creek Lumber Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The Arroyo Las Trancas stream and the Pacific Ocean are waters of the United States. Accordingly, Big Creek Lumber's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 5 of 21

CSPA is informed and believes, and thereupon alleges, that Big Creek Lumber has discharged, and continues to discharge, pollutants from the Facility to waters of the United States every day that there has been or will be any measurable discharge of storm water from the Facility since November 25, 1992. Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Big Creek Lumber is subject to penalties for violations of the Act since April 18, 2007.

## III.    Pollutant Discharges in Violation of the NPDES Permit.

Big Creek Lumber has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit. 33 U.S.C. § 1342. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id*.; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides: "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit." Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes: (1) that Big Creek Lumber continues to discharge pollutants in excess of benchmarks and (2) that Big Creek Lumber has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 6 of 21

Big Creek Lumber's ongoing violations are discussed further below.

> **A.    Big Creek Lumber Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

Big Creek Lumber has discharged and continues to discharge storm water with unacceptable levels of Zinc (Zn), pH, Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), Specific Conductance (SC), and Total Organic Carbon (TOC) in violation of the General Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. Big Creek Lumber's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

> **1.    Discharge of Storm Water Containing Zinc (Zn) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/17/2011 | North | Zn | 120 mg/L | 0.117 mg/L |
| 2/17/2011 | South | Zn | 450 mg/L | 0.117 mg/L |
| 2/17/2011 | West | Zn | 290 mg/L | 0.117 mg/L |
| 12/14/2010 | North | Zn | 1100 mg/L | 0.117 mg/L |
| 12/14/2010 | South | Zn | 420 mg/L | 0.117 mg/L |
| 12/14/2010 | West | Zn | 310 mg/L | 0.117 mg/L |
| 2/26/2010 | North | Zn | 810 mg/L | 0.117 mg/L |
| 2/26/2010 | South | Zn | 170 mg/L | 0.117 mg/L |
| 2/26/2010 | West | Zn | 420 mg/L | 0.117 mg/L |
| 10/13/2009 | North | Zn | 440 mg/L | 0.117 mg/L |
| 10/13/2009 | South | Zn | 150 mg/L | 0.117 mg/L |

Notice of Violation and Intent To File Suit
April 18, 2012
Page 7 of 21

| 10/13/2009 | West | Zn | 300 mg/L | 0.117 mg/L |
| 2/6/2009 | North | Zn | 123 mg/L | 0.117 mg/L |
| 2/6/2009 | South | Zn | 820 mg/L | 0.117 mg/L |
| 2/6/2009 | West | Zn | 110 mg/L | 0.117 mg/L |
| 12/15/2008 | North | Zn | 160 mg/L | 0.117 mg/L |
| 12/15/2008 | South | Zn | 820 mg/L | 0.117 mg/L |
| 12/15/2008 | West | Zn | 170 mg/L | 0.117 mg/L |
| 12/18/2007 | North | Zn | 0.53 mg/L | 0.117 mg/L |
| 12/18/2007 | South | Zn | 0.45 mg/L | 0.117 mg/L |
| 12/18/2007 | West | Zn | 0.25 mg/L | 0.117 mg/L |
| 12/06/2007 | North | Zn | 0.25 mg/L | 0.117 mg/L |
| 12/06/2007 | South | Zn | 0.53 mg/L | 0.117 mg/L |
| 12/06/2007 | West | Zn | 0.43 mg/L | 0.117 mg/L |
| 2/9/2007 | North | Zn | 0.17 mg/L | 0.117 mg/L |
| 2/9/2007 | South | Zn | 0.42 mg/L | 0.117 mg/L |
| 11/03/2006 | North | Zn | 0.29 mg/L | 0.117 mg/L |
| 11/03/2006 | West | Zn | 0.17 mg/L | 0.117 mg/L |

**2.    Discharge of Storm Water Containing pH at Concentration in Excess of EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/17/2011 | South | pH | 4.5 s.u. | 6.0 – 9.0 s.u. |
| 12/14/2010 | North | pH | 3.5 s.u. | 6.0 – 9.0 s.u. |
| 12/14/2010 | South | pH | 3.9 s.u. | 6.0 – 9.0 s.u. |
| 2/26/2010 | North | pH | 3.6 s.u. | 6.0 – 9.0 s.u. |

Notice of Violation and Intent To File Suit
April 18, 2012
Page 8 of 21

| 10/13/2009 | North | pH | 3.7 s.u. | 6.0 – 9.0 s.u. |
| 10/13/2009 | South | pH | 4.2 s.u. | 6.0 – 9.0 s.u. |
| 10/13/2009 | West | pH | 5.2 s.u. | 6.0 – 9.0 s.u. |
| 2/6/2009 | North | pH | 5.6 s.u. | 6.0 – 9.0 s.u. |
| 2/6/2009 | South | pH | 3.9 s.u. | 6.0 – 9.0 s.u. |
| 2/6/2009 | West | pH | 5.7 s.u. | 6.0 – 9.0 s.u. |
| 12/15/2008 | North | pH | 5.6 s.u. | 6.0 – 9.0 s.u. |
| 12/15/2008 | South | pH | 4.3 s.u. | 6.0 – 9.0 s.u. |
| 12/15/2008 | West | pH | 5.8 s.u. | 6.0 – 9.0 s.u. |
| 12/18/2007 | North | pH | 3.7 s.u. | 6.0 – 9.0 s.u. |
| 12/18/2007 | South | pH | 4.2 s.u. | 6.0 – 9.0 s.u. |
| 12/06/2007 | North | pH | 5.2 s.u. | 6.0 – 9.0 s.u. |
| 2/9/2007 | North | pH | 4.2 s.u. | 6.0 – 9.0 s.u. |
| 2/9/2007 | South | pH | 4.3 s.u. | 6.0 – 9.0 s.u. |
| 11/03/2006 | North | pH | 4.8 s.u. | 6.0 – 9.0 s.u. |

**3.      Discharge of Storm Water Containing Chemical Oxygen
Demand (COD) at Concentration in Excess of Applicable EPA
Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/17/2011 | South | COD | 240 mg/L | 120 mg/L |
| 2/17/2011 | West | COD | 380 mg/L | 120 mg/L |

Notice of Violation and Intent To File Suit
April 18, 2012
Page 9 of 21

| 12/14/2010 | West | COD | 360 mg/L | 120 mg/L |
| 2/26/2010 | South | COD | 130 mg/L | 120 mg/L |
| 2/26/2010 | West | COD | 300 mg/L | 120 mg/L |
| 10/13/2009 | North | COD | 230 mg/L | 120 mg/L |
| 10/13/2009 | South | COD | 480 mg/L | 120 mg/L |
| 10/13/2009 | West | COD | 170 mg/L | 120 mg/L |
| 2/6/2009 | South | COD | 220 mg/L | 120 mg/L |
| 2/6/2009 | West | COD | 150 mg/L | 120 mg/L |
| 12/15/2008 | North | COD | 160 mg/L | 120 mg/L |
| 12/15/2008 | South | COD | 290 mg/L | 120 mg/L |
| 12/15/2008 | West | COD | 240 mg/L | 120 mg/L |
| 12/18/2007 | North | COD | 170 mg/L | 120 mg/L |
| 12/18/2007 | South | COD | 290 mg/L | 120 mg/L |
| 12/18/2007 | West | COD | 230 mg/L | 120 mg/L |
| 12/06/2007 | South | COD | 330 mg/L | 120 mg/L |
| 12/06/2007 | West | COD | 270 mg/L | 120 mg/L |
| 2/9/2007 | South | COD | 170 mg/L | 120 mg/L |
| 2/9/2007 | West | COD | 160 mg/L | 120 mg/L |
| 11/03/2006 | North | COD | 410 mg/L | 120 mg/L |
| 11/03/2006 | West | COD | 270 mg/L | 120 mg/L |

Notice of Violation and Intent To File Suit
April 18, 2012
Page 10 of 21

**4.      Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/17/2011 | South | TSS | 440  mg/L | 100 mg/L |
| 2/17/2011 | North | TSS | 200 mg/L | 100 mg/L |
| 2/17/2011 | West | TSS | 330 mg/L | 100 mg/L |
| 12/14/2010 | West | TSS | 260 mg/L | 100 mg/L |
| 2/26/2010 | North | TSS | 190 mg/L | 100 mg/L |
| 2/26/2010 | South | TSS | 160 mg/L | 100 mg/L |
| 2/26/2010 | West | TSS | 650 mg/L | 100 mg/L |
| 10/13/2009 | North | TSS | 420 mg/L | 100 mg/L |
| 10/13/2009 | South | TSS | 480 mg/L | 100 mg/L |
| 2/6/2009 | South | TSS | 270 mg/L | 100 mg/L |
| 12/15/2008 | North | TSS | 160 mg/L | 100 mg/L |
| 12/18/2007 | North | TSS | 210 mg/L | 100 mg/L |
| 12/18/2007 | South | TSS | 440 mg/L | 100 mg/L |
| 12/18/2007 | West | TSS | 130 mg/L | 100 mg/L |
| 12/06/2007 | North | TSS | 1000 mg/L | 100 mg/L |
| 12/06/2007 | South | TSS | 380 mg/L | 100 mg/L |
| 12/06/2007 | West | TSS | 380 mg/L | 100 mg/L |

| 2/9/2007 | North | TSS | 150 mg/L | 100 mg/L |
|---|---|---|---|---|
| 2/9/2007 | South | TSS | 410 mg/L | 100 mg/L |
| 2/9/2007 | West | TSS | 110 mg/L | 100 mg/L |
| 11/03/2006 | North | TSS | 2670 mg/L | 100 mg/L |
| 11/03/2006 | West | TSS | 380 mg/L | 100 mg/L |

**5.      Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 2/17/2011 | South | SC | 380 µmhos/cm | 200 µmhos/cm |
| 12/14/2010 | South | SC | 1100 µmhos/cm | 200 µmhos/cm |
| 12/14/2010 | North | SC | 1100 µmhos/cm | 200 µmhos/cm |
| 2/26/2010 | North | SC | 1400 µmhos/cm | 200 µmhos/cm |
| 2/26/2010 | South | SC | 820 µmhos/cm | 200 µmhos/cm |
| 10/13/2009 | North | SC | 480 µmhos/cm | 200 µmhos/cm |
| 2/6/2009 | South | SC | 450 µmhos/cm | 200 µmhos/cm |
| 12/15/2008 | South | SC | 380 µmhos/cm | 200 µmhos/cm |
| 12/18/2007 | North | SC | 540 µmhos/cm | 200 µmhos/cm |
| 12/18/2007 | South | SC | 320 µmhos/cm | 200 µmhos/cm |
| 12/18/2007 | West | SC | 240 µmhos/cm | 200 µmhos/cm |
| 12/06/2007 | North | SC | 350 µmhos/cm | 200 µmhos/cm |

Notice of Violation and Intent To File Suit
April 18, 2012
Page 12 of 21

| | | | | |
|---|---|---|---|---|
| 2/9/2007 | North | SC | 210 µmhos/cm | 200 µmhos/cm |
| 2/9/2007 | South | SC | 260 µmhos/cm | 200 µmhos/cm |
| 11/03/2006 | North | SC | 470 µmhos/cm | 200 µmhos/cm |

6. **Discharge of Storm Water Containing Total Organic Carbon (TOC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 2/6/2009 | South | TOC | 220 mg/L | 110 mg/L |
| 2/6/2009 | West | TOC | 150 mg/L | 110 mg/L |
| 12/15/2008 | North | TOC | 160 mg/L | 110 mg/L |
| 12/15/2008 | South | TOC | 290 mg/L | 110 mg/L |
| 12/15/2008 | West | TOC | 240 mg/L | 110 mg/L |

CSPA's investigation, including its review of Big Creek Lumber's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark levels for specific conductivity and total organic carbon, indicates that Big Creek Lumber has not implemented BAT and BCT at the Facility for its discharges of Zinc (Zn), pH, Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), Specific Conductance (SC), Total Organic Carbon (TOC) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.  Big Creek Lumber was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations.  Thus, Big Creek Lumber is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Big Creek Lumber has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least April 18, 2007.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since April 18, 2007, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A,

Notice of Violation and Intent To File Suit
April 18, 2012
Page 13 of 21

attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Big
Creek Lumber has discharged storm water containing impermissible levels of Zinc (Zn),
pH, Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), Specific
Conductance (SC), Total Organic Carbon (TOC) and other unmonitored pollutants (e.g.
aluminum; iron; arsenic; copper; biochemical oxygen demand; and, mercury) in violation
of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2)
of the General Permit.

    These unlawful discharges from the Facility are ongoing.  Each discharge of
storm water containing any pollutants from the Facility without the implementation of
BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent
with the five-year statute of limitations applicable to citizen enforcement actions brought
pursuant to the federal Clean Water Act, Big Creek Lumber is subject to penalties for
violations of the General Permit and the Act since April 18, 2007.

    **B.    Big Creek Lumber Has Failed to Implement an Adequate Monitoring
         & Reporting Plan.**

    Section B of the General Industrial Storm Water Permit requires that dischargers
develop and implement an adequate Monitoring and Reporting Plan by no later than
October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that
dischargers conduct regularly scheduled visual observations of non-storm water and
storm water discharges from the Facility and to record and report such observations to the
Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall
collect storm water samples during the first hour of discharge from (1) the first storm
event of the wet season, and (2) at least one other storm event in the wet season.  All
storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires
that the samples shall be analyzed for total suspended solids, pH, specific conductance,
and total organic carbon.  Oil and grease may be substituted for total organic carbon.
Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples
for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water
discharges in significant quantities."  Section B(10) of the General Permit provides that
"facility operators shall explain how the facility's monitoring program will satisfy the
monitoring program objectives of [General Permit] Section B.2."

    Based on its investigation, CSPA is informed and believes that Big Creek Lumber
has failed to develop and implement an adequate Monitoring & Reporting Plan.  First,
based on its review of publicly available documents, CSPA is informed and believes that
Big Creek Lumber has failed to collect storm water samples during at least two
qualifying storms events, as defined by the General Permit, during each of the past five
Wet Seasons.  Second, based on its review of publicly available documents, CSPA is
informed and believes that Big Creek Lumber has failed to conduct the monthly visual
monitoring of storm water discharges and the quarterly visual observations of
unauthorized non-storm water discharges required under the General Permit during each
of the past five Wet Seasons.  Third, based on its review of publicly available documents,

Notice of Violation and Intent To File Suit
April 18, 2012
Page 14 of 21

CSPA is informed and believes that for the past five Wet Seasons, Big Creek Lumber has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility. Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Big Creek Lumber is subject to penalties for violations of the General Permit and the Act since April 18, 2007. These violations are set forth in greater detail below:

1.   **Big Creek Lumber Has Failed to Collect Storm Water Samples During at Least Two Rain Events In Each of the Last Five Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Big Creek Lumber has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past five Wet Seasons, as required by the General Permit. For example, CSPA notes that the Annual Report filed by Big Creek Lumber for the Facility for the 2010-2011 Wet Season reported that Big Creek Lumber analyzed samples of storm water discharged during two qualifying storm events that season. However, upon closer scrutiny it turns out that one storm sampled was not a qualifying storm event within the meaning of the General Permit (discussed further below). Similarly, in the 2009-2010 Annual Report, Big Creek Lumber sampled from a storm event that was not a qualifying storm event, either. Further, in each of the 2008-2009, 2007-2008, and 2006-2007 Annual Reports, Big Creek Lumber never sampled from a qualifying storm event.

Big Creek Lumber reported in four of the five Wet Seasons (i.e., 2006-2007; 2007-2008; 2008-2009; and, 2009-2010 Wet Seasons), that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during three of those four Wet Seasons. For example, Big Creek Lumber reported in its 2008-2009 Annual Report that it sampled the first qualifying storm event of the Wet Season, but Big Creek Lumber's first sample is from December 15, 2008. Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2008-2009 Wet Season occurred as early as Friday, October 3, 2008, when 0.28" of rain fell on the Facility. This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

Further, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than the one sampling/discharge point currently designated by Big Creek Lumber. This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 15 of 21

**2.      Big Creek Lumber Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." General Permit, Section B(4)(a). As evidenced by the entries on Form 4 Monthly Visual Observations contained in Big Creek Lumber's annual reports for the last five Wet Seasons, CSPA is informed and believes that Big Creek Lumber has failed to comply with this requirement of the General Permit.

Specifically, Big Creek Lumber failed to conduct monthly visual observations of discharges from qualifying storm events for most months during any of the past five Wet Seasons. Instead, Big Creek Lumber documented its visual observations of storm water that discharged during non-qualifying storm events or on dates during which no rain fell on the Facility, for most months during the entire Wet Season of each of the past five years (discussed further below). However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Big Creek Lumber could have observed.

For example, Big Creek Lumber reported in its 2010-2011 Annual Report that it observed a qualifying storm event on Thursday, December 16, 2010. However, CSPA is informed and believes that this could not possibly be true because 0.27" of rain fell on the Facility two days prior, on December 14, 2010, likely making that December 14th storm a qualifying storm event and disqualifying all storm events for the next three days. Big Creek Lumber's failure to conduct this required monthly Wet Season visual monitoring extends back to at least April 18, 2007. Big Creek Lumber's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

**4.      Big Creek Lumber Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since April 18, 2007.**

CSPA is informed and believes that publicly available documents demonstrate Big Creek Lumber's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit. For example, while in its 2010-2011 Annual Report Big Creek Lumber reported having collected samples of storm water discharged during two qualifying storm events, only one of the two storm events sampled was a qualifying storm event within the meaning of the General Permit. Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on February 17, 2011 was not a qualifying storm event because enough rain fell on the Facility one day prior to likely result in a discharge of storm water from the Facility, thereby invalidating the February 17th storm as a qualifying storm event. Specifically, Big Creek Lumber sampled a rain event on

Notice of Violation and Intent To File Suit
April 18, 2012
Page 16 of 21

February 17, 2011 that produced 1.65" of rainfall on the Facility. However, one day prior, on Wednesday, February 16, 2011, 0.79" of rain fell on the Facility. Therefore, the February 16th storm event likely renders any storm occurring for three days afterwards a non-qualifying storm event.

Additionally, Big Creek Lumber is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program." General Permit Section B.10.a.iii. The Regional Board has determined that the appropriate laboratory test method to employ when analyzing storm water samples for the presence and concentration of oil and grease is EPA method 413.2 or 1664. Additionally, the Regional Board has determined that the appropriate detection limit that should be applied when using either method is 1.0 mg/L.

However, as demonstrated by Big Creek Lumber's annual report filed in 2010-2011, the test method employed by the laboratory utilized by Big Creek Lumber to analyze the concentration of oil and grease in the storm water discharged from its Facility was not EPA method 413.2 or 1664, but rather, EPA method A5520B. In addition, the laboratory employed by Big Creek Lumber to analyze the storm water sample collected for both samples applied an inappropriately high detection limit of 5.0 mg/L. In fact, Big Creek Lumber used an inappropriate analysis detection limit for zinc, chemical oxygen demand, and total suspended solids in all five of its Annual Reports.

Big Creek Lumber is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit." General Permit Section B.2.a. ("Monitoring Program Objectives"). Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Big Creek Lumber is subject to penalties for these violations of the General Permit and the Act since April 18, 2007.

**C.    Big Creek Lumber Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). CSPA's investigation indicates that Big Creek Lumber has not implemented BAT and BCT at the Facility for its discharges of Zinc (Zn), pH, Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), Specific Conductance (SC), Total Organic Carbon (TOC) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 17 of 21

        To meet the BAT/BCT requirement of the General Permit, Big Creek Lumber
must evaluate all pollutant sources at the Facility and implement the best structural and
non-structural management practices economically achievable to reduce or prevent the
discharge of pollutants from the Facility.  Based on the limited information available
regarding the internal structure of the Facility, CSPA believes that at a minimum Big
Creek Lumber must improve its housekeeping practices, store materials that act as
pollutant sources under cover or in contained areas, treat storm water to reduce pollutants
before discharge (e.g., with filters or treatment boxes), and/or prevent storm water
discharge altogether.  Big Creek Lumber has failed to adequately implement such
measures.

        Big Creek Lumber was required to have implemented BAT and BCT by no later
than October 1, 1992.  Therefore, Big Creek Lumber has been in continuous violation of
the BAT and BCT requirements every day since October 1, 1992, and will continue to be
in violation every day that it fails to implement BAT and BCT.  Big Creek Lumber is
subject to penalties for violations of the General Permit and the Act occurring since April
18, 2007.

        **D.      Big Creek Lumber Has Failed to Develop and Implement an
                Adequate Storm Water Pollution Prevention Plan.**

        Section A(1) and Provision E(2) of the General Permit require dischargers of
storm water associated with industrial activity to develop, implement, and update an
adequate storm water pollution prevention plan ("SWPPP") no later than October 1,
1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI
pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing
SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but
in any case, no later than August 9, 1997.

        The SWPPP must, among other requirements, identify and evaluate sources of
pollutants associated with industrial activity that may affect the quality of storm and
non-storm water discharges from the facility and identify and implement site-specific
best management practices ("BMPs") to reduce or prevent pollutants associated with
industrial activities in storm water and authorized non-storm water discharges (General
Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT
(Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and
their responsibilities for developing and implementing the SWPPP (General Permit,
Section A(3)); a site map showing the facility boundaries, storm water drainage areas
with flow pattern and nearby water bodies, the location of the storm water collection,
conveyance and discharge system, structural control measures, impervious areas, areas of
actual and potential pollutant contact, and areas of industrial activity (General Permit,
Section A(4)); a list of significant materials handled and stored at the site (General
Permit, Section A(5)); a description of potential pollutant sources including industrial
processes, material handling and storage areas, dust and particulate generating activities,
a description of significant spills and leaks, a list of all non-storm water discharges and

their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that Big Creek Lumber has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Big Creek Lumber has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Big Creek Lumber has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  Big Creek Lumber is subject to penalties for violations of the General Permit and the Act occurring since April 18, 2007.

**E.      Big Creek Lumber Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Big Creek Lumber is discharging elevated levels of Zinc (Zn), pH, Chemical Oxygen Demand (COD), Total Suspended Solids (TSS), Specific Conductance (SC), Total Organic Carbon (TOC) and other unmonitored pollutants that

are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Big Creek Lumber was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Big Creek Lumber was aware of high levels of these pollutants prior to April 18, 2007.  Likewise, Big Creek Lumber has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d).  Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9).  Big Creek Lumber has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since April 18, 2007, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  Big Creek Lumber is subject to penalties for violations of the General Permit and the Act occurring since April 18, 2007.

### F.    Big Creek Lumber Has Failed to File Timely, True and Correct Reports.

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Big Creek Lumber has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, Big Creek Lumber reported in four Annual Reports filed for the past five Wet Seasons (i.e., 2006-2007; 2007-2008; 2008-2009; and 2009-2010) that it observed storm water discharges occurring during the first storm of every Wet Season.  However, as discussed above, based on CSPA's review of publicly available rainfall data, CSPA believes this cannot possibly be true.

Further, Big Creek Lumber failed to sample from qualifying storm events in eight out of ten storm water samples collected during the last five Wet Seasons.  For example, as discussed above, in 2010-2011, Big Creek Lumber sampled from a storm event on February 17, 2011 that was not a qualifying storm event.  Further, in the 2009-2010 Annual Report, Big Creek Lumber reported that it sampled a qualifying storm event on February 26, 2010.  Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on February 26, 2010 was not a qualifying storm event because enough rain fell on the Facility two days prior

Notice of Violation and Intent To File Suit
April 18, 2012
Page 20 of 21

to likely result in a discharge of storm water from the Facility, thereby invalidating the February 26, 2010 storm as a qualifying storm event.  Specifically, 1.54" of rain fell on the Facility on Wednesday, February 24, 2010.

Further, Big Creek Lumber failed to comply with the monthly visual observations of storm water discharges requirement for every single Annul Report filed for the Facility for each of the last five years.  In the 2010-2011 Annual Report, Big Creek Lumber only observed one single qualifying storm event within the meaning of the General Permit. For example, Big Creek Lumber reported that it observed a qualifying storm event on December 16, 2010.  However, based on publicly available rainfall data, CSPA is informed and believes that this cannot possibly be true.  On Tuesday, December 14, 2010, 0.27" of rain fell on the Facility, likely invalidating the storm observed on December 16th.  In the 2009-2010 Annual Report, Big Creek Lumber reported that it observed discharge from a qualifying storm event on December 12, 2009.  However, based on publicly available rainfall data, CSPA is informed and believes that this cannot possibly be true.  One day prior to December 12, on Friday, December 11, 0.43" of rain fell on the Facility, thereby invalidating the December 12, 2009 storm as a qualifying storm event.

These are only a few examples of how Big Creek Lumber has failed to file completely true and accurate reports.  As indicated above, Big Creek Lumber has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, Big Creek Lumber has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Big Creek Lumber submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  Big Creek Lumber's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Big Creek Lumber is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since April 18, 2007.

## IV.    Persons Responsible for the Violations.

CSPA puts Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson on notice that it intends to include those persons in this action.

## V.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

Notice of Violation and Intent To File Suit
April 18, 2012
Page 21 of 21

## VI.    Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard                          Tel. (707) 763-7227
Erik M. Roper                              Fax. (707) 763-9227
Emily J. Brand                             Email:
Law Offices of Andrew L. Packard              Andrew@PackardLawOffices.com
100 Petaluma Boulevard, Suite 301             Erik@PackardLawOffices.com
Petaluma, CA 94952                            Emily@PackardLawOffices.com


## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Big Creek Lumber Company, Michael Tuttle and Frank Hutchinson and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Roger Briggs, Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401

**ATTACHMENT A**
**Notice of Intent to File Suit, Big Creek Lumber (7 miles north of Davenport, CA)**
**Significant Rain Events,\* April 18, 2007 – April 18, 2012**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| April | 20 | 2007 | Dec. | 24 | 2008 | Jan. | 26 | 2010 | Jan. | 29 | 2011 |
| April | 22 | 2007 | Dec. | 25 | 2008 | Jan. | 29 | 2010 | Jan. | 30 | 2011 |
| May | 02 | 2007 | Jan. | 02 | 2009 | Feb | 04 | 2010 | Feb. | 14 | 2011 |
| May | 04 | 2007 | Jan. | 21 | 2009 | Feb | 05 | 2010 | Feb. | 15 | 2011 |
| Oct | 12 | 2007 | Jan. | 22 | 2009 | Feb. | 06 | 2010 | Feb. | 16 | 2011 |
| Oct | 16 | 2007 | Jan. | 23 | 2009 | Feb. | 09 | 2010 | Feb. | 17 | 2011 |
| Nov | 10 | 2007 | Feb. | 05 | 2009 | Feb. | 12 | 2010 | Feb. | 18 | 2011 |
| Nov | 11 | 2007 | Feb. | 06 | 2009 | Feb. | 21 | 2010 | Feb. | 19 | 2011 |
| Dec. | 17 | 2007 | Feb. | 08 | 2009 | Feb. | 23 | 2010 | Feb. | 24 | 2011 |
| Dec. | 18 | 2007 | Feb. | 10 | 2009 | Feb. | 24 | 2010 | Feb. | 25 | 2011 |
| Dec. | 20 | 2007 | Feb. | 11 | 2009 | Feb. | 26 | 2010 | Mar. | 02 | 2011 |
| Dec. | 29 | 2007 | Feb. | 13 | 2009 | Feb. | 27 | 2010 | Mar. | 06 | 2011 |
| Jan | 03 | 2008 | Feb. | 14 | 2009 | Mar. | 02 | 2010 | Mar. | 13 | 2011 |
| Jan | 04 | 2008 | Feb. | 15 | 2009 | Mar. | 03 | 2010 | Mar. | 14 | 2011 |
| Jan | 05 | 2008 | Feb. | 16 | 2009 | Mar. | 10 | 2010 | Mar. | 15 | 2011 |
| Jan | 06 | 2008 | Feb. | 17 | 2009 | Mar. | 12 | 2010 | Mar. | 16 | 2011 |
| Jan | 08 | 2008 | Feb. | 21 | 2009 | Mar. | 31 | 2010 | Mar. | 18 | 2011 |
| Jan | 21 | 2008 | Feb. | 22 | 2009 | April | 02 | 2010 | Mar. | 19 | 2011 |
| Jan | 22 | 2008 | Feb. | 23 | 2009 | April | 04 | 2010 | Mar. | 20 | 2011 |
| Jan | 24 | 2008 | Feb. | 26 | 2009 | April | 05 | 2010 | Mar. | 21 | 2011 |
| Jan | 25 | 2008 | Mar. | 01 | 2009 | April | 11 | 2010 | Mar. | 22 | 2011 |
| Jan | 26 | 2008 | Mar. | 02 | 2009 | April | 12 | 2010 | Mar. | 23 | 2011 |
| Jan. | 27 | 2008 | Mar. | 03 | 2009 | April | 20 | 2010 | Mar. | 24 | 2011 |
| Jan. | 28 | 2008 | Mar. | 05 | 2009 | April | 27 | 2010 | Mar. | 25 | 2011 |
| Jan. | 29 | 2008 | Mar. | 21 | 2009 | April | 28 | 2010 | Mar. | 26 | 2011 |
| Jan. | 30 | 2008 | Mar. | 22 | 2009 | May | 10 | 2010 | Mar. | 27 | 2011 |
| Jan. | 31 | 2008 | April | 07 | 2009 | May | 25 | 2010 | Apr | 13 | 2011 |
| Feb | 01 | 2008 | April | 09 | 2009 | Oct. | 21 | 2010 | Apr | 20 | 2011 |
| Feb | 02 | 2008 | May | 01 | 2009 | Oct. | 23 | 2010 | Apr | 24 | 2011 |
| Feb | 03 | 2008 | May | 03 | 2009 | Oct. | 24 | 2010 | May | 14 | 2011 |
| Feb | 19 | 2008 | May | 04 | 2009 | Oct. | 30 | 2010 | May | 16 | 2011 |
| Feb | 20 | 2008 | May | 05 | 2009 | Nov. | 07 | 2010 | May | 17 | 2011 |
| Feb | 21 | 2008 | Oct. | 13 | 2009 | Nov. | 09 | 2010 | May | 25 | 2011 |
| Feb | 22 | 2008 | Oct. | 19 | 2009 | Nov. | 19 | 2010 | Jun | 04 | 2011 |
| Feb | 23 | 2008 | Nov. | 20 | 2009 | Nov. | 20 | 2010 | Jun | 28 | 2011 |
| Feb | 24 | 2008 | Dec. | 07 | 2009 | Nov. | 21 | 2010 | Oct | 03 | 2011 |
| Mar | 15 | 2008 | Dec. | 10 | 2009 | Nov. | 22 | 2010 | Oct | 04 | 2011 |
| Mar. | 28 | 2008 | Dec. | 11 | 2009 | Nov. | 23 | 2010 | Oct | 05 | 2011 |
| Apr. | 02 | 2008 | Dec. | 12 | 2009 | Nov. | 27 | 2010 | Nov | 04 | 2011 |
| Apr. | 22 | 2008 | Dec. | 13 | 2009 | Dec. | 05 | 2010 | Nov | 05 | 2011 |
| Apr. | 23 | 2008 | Dec. | 26 | 2009 | Dec. | 08 | 2010 | Nov | 11 | 2011 |
| Oct. | 03 | 2008 | Dec. | 27 | 2009 | Dec. | 14 | 2010 | Nov | 19 | 2011 |
| Oct. | 04 | 2008 | Dec. | 29 | 2009 | Dec. | 16 | 2010 | Nov | 20 | 2011 |
| Oct. | 30 | 2008 | Dec. | 30 | 2009 | Dec. | 17 | 2010 | Nov | 20 | 2011 |
| Oct. | 31 | 2008 | Jan. | 12 | 2010 | Dec. | 18 | 2010 | Nov | 20 | 2011 |
| Nov. | 01 | 2008 | Jan. | 13 | 2010 | Dec. | 19 | 2010 | Dec | 15 | 2011 |
| Nov. | 02 | 2008 | Jan. | 17 | 2010 | Dec. | 20 | 2010 | Jan | 19 | 2012 |
| Nov. | 03 | 2008 | Jan. | 18 | 2010 | Dec. | 21 | 2010 | Jan | 20 | 2012 |
| Nov. | 26 | 2008 | Jan. | 19 | 2010 | Dec. | 22 | 2010 | Jan | 21 | 2012 |
| Dec. | 14 | 2008 | Jan. | 20 | 2010 | Dec. | 25 | 2010 | Jan | 22 | 2012 |
| Dec. | 15 | 2008 | Jan. | 21 | 2010 | Dec. | 28 | 2010 | Jan | 23 | 2012 |
| Dec. | 16 | 2008 | Jan. | 22 | 2010 | Dec. | 29 | 2010 | Jan | 24 | 2012 |
| Dec. | 19 | 2008 | Jan. | 23 | 2010 | Jan. | 01 | 2011 | Jan | 25 | 2012 |
| Dec. | 21 | 2008 | Jan. | 25 | 2010 | Jan. | 02 | 2011 | Feb | 13 | 2012 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Big Creek Lumber (7 miles north of Davenport, CA)**
**Significant Rain Events,\* April 18, 2007 – April 18, 2012**

Feb   29   2012
Mar   01   2012
Mar   13   2012
Mar   14   2012
Mar   15   2012
Mar   16   2012
Mar   17   2012
Mar   18   2012
Mar   24   2012
Mar   27   2012
Mar   31   2012
Apr   10   2012
Apr   11   2012
Apr   12   2012
Apr   13   2012

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C**

| Parameter | Value |
|---|---|
| pH | 6.0 – 9.0 s.u. |
| Specific Conductivity | 200 μmhos/cm |
| Total Suspended Solids | 100 mg/L |
| Oil & Grease | 15 mg/L |
| Zinc, Total | 0.117 mg/L |
| Chemical Oxygen Demand, Total | 120 mg/L |
| Aluminum, Total | 0.75 mg/L |
| Iron, Total | 1.0 mg/L |
| Copper, Total | 0.0636 mg/L |